**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| SHAN O. BEARD, | ) |
| | ) |
| Plaintiff. | ) |
| | ) |
| v. | ) |
| | )     Civil Case No. 10-1425 |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## <u>MEMORANDUM OPINION</u>

CONTI, District Judge.

## I.   INTRODUCTION

Shan O. Beard ("Plaintiff" or "Beard") brought this action pursuant to 42 U.S.C. §

405(g), seeking review of the final determination of the Commissioner of Social Security

("Defendant" or "Commissioner") denying his application for disability insurance benefits

("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security

Act, 42 U.S.C. §§ 401-33, 1381-83f ("Act").  This matter comes before the court on cross-

motions for summary judgment.  (ECF Nos. 8, 10).  The record was developed at the

administrative level.  For the following reasons, Plaintiff's Motion for Summary Judgment is

GRANTED, in part, and DENIED, in part, and Defendant's Motion for Summary Judgment is

DENIED.

## II.  PROCEDURAL HISTORY

Plaintiff filed for DIB and SSI with the Social Security Administration on August 24, 2007, claiming an inability to work due to disability as of August 1, 2006.  (R. at 15, 57-59).[1] Plaintiff was initially denied benefits on January 25, 2008.  (R. at 15, 30-33, 334-38).  A hearing was scheduled for June 24, 2009, but was adjourned and rescheduled for August 19, 2009 in order for Plaintiff to appear and testify represented by counsel.  (R. at 15, 341-82).  A vocational expert testified at the second hearing.  (R. at 15-36).  The Administrative Law Judge ("ALJ") issued his decision denying benefits to Plaintiff on September 1, 2009.  (R. at 12-26).  Plaintiff filed a request for review of the ALJ's decision by the Appeals Council.  The Appeals Council denied his request on September 24, 2010, thereby making the decision of the ALJ the final decision of the Commissioner.  (R. at 6-9).

Plaintiff filed his Complaint in this court on November 9, 2010.  (ECF No. 2).  Defendant filed his Answer on February 24, 2011.  (ECF No. 6).  Cross-motions for summary judgment followed.  (ECF Nos. 8, 10).

## III.  STATEMENT OF THE CASE

### A.  General Background

Beard was born on September 14, 1980, and was twenty -eight years old at the time of his administrative hearing.  (R. at 57, 349).  Plaintiff completed the tenth grade, but did not graduate from high school or obtain a GED.  (R. at 356).  Plaintiff lived independently in a rented mobile home with his wife and son.  (R. at 94-110).  Plaintiff had a daughter who did not reside with him.  (R. at 298).  His wife collected social security disability benefits because of a seizure

---

[1]  Citations to ECF. No. 7, the Record, are hereinafter referred to as "R. at __."

disorder. (R. at 360, 369). The revenue from Plaintiff's tattoo parlor, and food stamps, were additional sources of income for the family. (R. at 369). Plaintiff also received medical benefits through the state. (Id.)

Plaintiff initially alleged that his ability to maintain a full-time job was severely limited by the effects of panic disorder, anxiety, migraines, brain damage, and gastrointestinal conditions. (R. at 73). Plaintiff's past relevant work included employment as a janitor with a commercial cleaning company, a metal fabricator with a powder coating company, and up to and including the time of his administrative hearing, a tattoo artist in his own tattoo parlor. (R. at 74). Plaintiff, however, did not engage in substantial gainful activity since 2006.

An average day for Plaintiff included waking in the morning and showering, watching television with his son and wife, and spending the rest of the day at his tattoo business. (R. at 94). Plaintiff helped his wife care for their son, helped with household chores, and performed the yardwork. (R. at 95-96). Plaintiff was capable of driving, and independently did so. (R. at 97). Aside from going to work, Plaintiff was not motivated to go out because of a desire to avoid contact with groups of people. (Id.). Plaintiff's wife handled their personal finances. (Id.).

**B. Treatment History**

Plaintiff was treated in the emergency department of Latrobe Area Hospital in Latrobe, Pennsylvania on June 19, 2005, for complaints of abdominal pain, diarrhea, and vomiting. (R. at 116-26). At that time, he was noted to have upper gastrointestinal bleeding. (R. at 126). Upon examination, he was physically unremarkable. (R. at 118). An endoscopy was performed, and mild gastritis was noted, but there was no physical explanation for the symptoms about which he complained. (R. at 120-21). Plaintiff was stabilized, was provided with a prescription for

medicine to manage his discomfort, and was advised to undergo a colonoscopy. (R. at 121). He was discharged the following day. (R. at 116-17).

Plaintiff was again treated at Latrobe Area Hospital beginning on September 26, 2005. (R. at 127-47, 209-20). He continued to complain about abdominal pain and vomiting, but also noticed dark stools. (R. at 127-28, 130, 132, 140-41, 209-10, 212-13). Medical records indicated that a prior endoscopy found only mild gastritis. (R. at 128, 133, 140). Hospital staff felt that Plaintiff's complaints were out of proportion to objective physical findings. (R. at 128). Diagnostic testing and physical examination were unremarkable. (R. at 133, 137). A colonoscopy was not able to be completed because Plaintiff did not tolerate preparation. (R. at 140). Plaintiff frequently requested Dilaudid for pain while at the hospital. (R. at 128). Plaintiff, however, was not provided with narcotic medication because there were no clinical findings indicating a need for that kind of medication. (R. at 128). He had a routine discharge on September 29, 2005, following improvement in his claimed abdominal pain. (R. at 127-29). Plaintiff was diagnosed with abdominal pain, gastritis, and anxiety/stress syndrome. (R. at 127-28, 214-15).

Plaintiff was treated at Latrobe Area Hospital's emergency department on four occasions between November 2005 and September 2007 for complaints of abdominal pain. (R. at 155-63, 175-87, 188-200, 275-83). Plaintiff was typically diagnosed with gastritis and abdominal pain, and some bleeding was noted. (R. at 161, 181, 198, 279-80). Diagnostic testing, however, was typically unremarkable, and the cause of Plaintiff's alleged pain was not pinpointed. (Id.). Plaintiff was released from the hospital in stable condition, was provided with prescription medication to treat his gastritis, and was advised to follow up with his primary care physician and to see a stomach specialist. (Id.).

Plaintiff was seen at the Latrobe Area Hospital emergency department on November 16, 2006, due to a panic attack. (R. at 148-54). He was discharged that same day, and was provided with prescription medication for anxiety. (R. at 154). Plaintiff was advised to see his primary care physician and to seek counseling. (Id.).

Plaintiff began treatment with Carlos J. Marrero, M.D., for migraines on August 6, 2008. (R. at 288-93). At that time, Plaintiff was not taking any medication for his headaches. (R. at 292). The headaches were originally noted to be worse at bedtime, although improved by morning. (Id.). Bright lights and loud noises exacerbated Plaintiff's pain, and nausea and blurred vision accompanied the headaches at least three times per week. (Id.). An initial physical examination was unremarkable. (Id.). An x-ray, MRI, and blood work were recommended. (R. at 293). Plaintiff was to begin taking prescription medication for migraine treatment. (Id.).

Plaintiff was seen in the emergency department of Latrobe Area Hospital on August 10, 2008, following the breakout of an itchy rash on his left arm and around his eyes. (R. at 287). It was attributed to an allergic reaction to new prescription medication for migraines. (Id.). At a follow-up appointment with Dr. Marrero, Plaintiff's medications were changed. (R. at 290).

Over the course of treatment with Dr. Marrero, Plaintiff's medications were adjusted to treat more effectively his migraine pain. (R. at 288-90). Plaintiff's migraines eventually ceased following his December 29, 2008, checkup with Dr. Marrero. (R. at 288-90). Plaintiff continued to experience pain and visual difficulties as a result of the rash, which was later determined to have been a shingles. (R. at 290-93). The cessation of migraine headaches continued through June 2009 – the last appointment with Dr. Marrero on record. (R. at 288). On August 18, 2009,

Plaintiff was seen on an emergency basis at the Latrobe Area Hospital for migraine headache pain. (R. at 330-31).

### C. Functionality Assessments

Chantal Deines, Psy.D., performed a psychiatric evaluation of Plaintiff on behalf of the Pennsylvania Bureau of Disability Determination on October 19, 2007. (R. at 236-47). Dr. Deines did not review Plaintiff's medical records prior to completing the evaluation and relied upon an in-person examination and Plaintiff's personal accounts. (Id.). Plaintiff told Dr. Deines he suffered from ulcers, mental illnesses, migraines, and brain damage from past head injuries. (R. at 236-37). Plaintiff complained about difficulty working with others, anxiety and panic attacks, difficulty sleeping, and argumentativeness. (Id.). Plaintiff also complained about daily migraines that could last up to three days at a time. (R. at 237). Forgetfulness was an alleged side effect of the migraines. (Id.). Plaintiff reported that he was enrolled in special education classes when he was a child due to learning deficits. (Id.). He said he quit school in tenth grade because he had a newly born daughter and was not a good student. (R. at 239). Plaintiff reported failing the test to earn his GED three times. (R. at 239, 374). Plaintiff described his ulcers and gastrointestinal issues as the major barriers to maintaining full-time employment, but he also indicated that when he took the medication prescribed to treat these conditions, his pain was "not that bad." (R. at 240).

Plaintiff drove to his evaluation, and arrived approximately one hour early. (R. at 241). Plaintiff was casually and cleanly dressed, neatly groomed, and presented with no overt behavioral problems. (Id.). Plaintiff exhibited an easy, conversational manner, spoke easily, and was entirely appropriate throughout the duration of the evaluation. (Id.). Plaintiff described experiencing mood fluctuation, but Dr. Deines noted Plaintiff showed neutral and relaxed affect.

(R. at 241). Plaintiff's thought processes and productivity were unremarkable, there was no hesitancy, flight of ideas, distraction, or preoccupation, and he was capable of interpreting proverbs. (R. at 241-42). Plaintiff exhibited difficulty with math and had a poor fund of knowledge. (R. at 242). He was considered to possess low-average intelligence. (Id.). Testing showed potential difficulty with sustained, complex tasks requiring concentration. (R. at 243). Plaintiff's judgment was intact, however, and he did not present with significant impulsivity. (Id.). Plaintiff did not report issues with activities of daily living. (R. at 244). He spent most of his time with his father, brother, wife, and son. (R. at 245). Plaintiff enjoyed drawing and tattooing, and spent a significant amount of time and money working on his car – adding rims, neon lights, and an in-dashboard DVD player, among other items. (Id.).

Dr. Deines diagnosed anxiety disorder, and personality disorder. (R. at 244). He provided a global assessment of functioning[2] ("GAF") score of 51. (Id.). Plaintiff did not meet the requirements for major depressive disorder or bipolar disorder, and the extent of his difficulty with anxiety was unclear. (Id.). Plaintiff was considered a candidate for psychotherapy and

---

[2]       The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 91 – 100 exhibits "[s]uperior functioning in a wide range of activities" and "no symptoms;" of 81 – 90 exhibits few, if any, symptoms and "good functioning in all areas," is "interested and involved in a wide range of activities," is "socially effective," is "generally satisfied with life," and experiences no more than "everyday problems or concerns;" of 71 – 80, may exhibit "transient and expectable reactions to psychosocial stressors" and "no more than slight impairment in social, occupational, or school functioning;" of 61 – 70 may have "[s]ome mild symptoms" or "some difficulty in social, occupational, or school functioning, but generally functioning pretty well" and "has some meaningful interpersonal relationships;" of 51 – 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 41 – 50 may have "[s]erious symptoms (e.g., suicidal ideation …)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 31 – 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood;" of 21 – 30 may be "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., … suicidal preoccupation)" or "inability to function in almost all areas;" of 11 – 20 may have "[s]ome danger of hurting self or others" or "occasionally fails to maintain minimal personal hygiene" or "gross impairment in communication;" of 1 – 10 may have "[p]ersistent danger of severely hurting self or others" or "persistent inability to maintain minimal personal hygiene" or "serious suicidal act with clear expectation of death." *Id.*

medication management.  (Id.).  While he did not show difficulty with persistence or pace, concentration was believed to be problematic when completing tasks which were complicated or for which Plaintiff held no interest.  (R. at 245).  Working with large groups of people could be difficult for Plaintiff.  (R. at 246).  Plaintiff would be slightly limited working with the public and co-workers, generally, as well as responding appropriately to work pressures in a usual setting and to changes in a routine work setting.  (Id.).  He would have moderate difficulty with supervisors.  (Id.).  Plaintiff was not otherwise limited, and could manage benefits in his own best interests, particularly with help from his spouse.  (R. at 247).

State agency evaluator Douglas Schiller, Ph.D., completed a mental residual functional capacity ("RFC") assessment of Plaintiff on October 29, 2007.  (R. at 261-63).  In it, he indicated that Plaintiff would be only moderately to not significantly limited in all areas of functioning.  (Id.).  Based upon Plaintiff's medical record, he concluded that Plaintiff suffered from anxiety and personality disorder.  (R. at 261).  Dr. Schiller adopted the report of Dr. Deines as being consistent with the medical record.  (R. at 263).

On December 21, 2007, Plaintiff underwent a physical evaluation by Robert L. Davoli, M.D., on behalf of the Pennsylvania Bureau of Disability Determination.  (R. at 264-67).  Dr. Davoli noted that Plaintiff claimed he was disabled from working due to head injuries resulting in migraines and mental illness.  (R. at 264).  Plaintiff claimed that at the age of eight, he was hit in the head by a sledgehammer falling from a roof.  (Id.).  CT scans of Plaintiff's head were unremarkable, however, and he was never seen by a neurologist.  (R. at 264-65).  Dr. Davoli observed no evidence of a psychiatric history, and Plaintiff was only given Ativan on a per needed basis at Latrobe Area Hospital for panic attacks.  (R. at 265).  Plaintiff claimed to have

stomach ulcers in the past, and other gastrointestinal issues.  (Id.).  Dr. Davoli noted that Plaintiff was only treated for such issues with Prilosec.  (Id.).

Dr. Davoli considered Plaintiff's claim of brain damage to be questionable, and found no evidence in the record which pointed to that damage.  (Id.).  Upon examination, Plaintiff was physically unremarkable.  (R. at 266).  Neurological examination returned normal results.  (Id.).  Plaintiff's gait was normal, his range of motion was normal, and his ability to sit, stand, bend, walk, lift, and grasp was normal.  (Id.).  Plaintiff was alert and oriented, appeared to have a normal mental status, and had no difficulty with abstract thinking.  (Id.).  Dr. Davoli concluded that Plaintiff had no physical limitations.  (Id.).

A physical RFC assessment of Plaintiff was completed by state agency evaluator Nghia Van Tran, M.D., on January 11, 2008.  (R. at 268-74).  Based upon a review of the medical record, Plaintiff was diagnosed with migraine headaches.  (R. at 273).  He was determined to be capable of occasionally lifting over one hundred pounds, frequently lifting over fifty pounds, standing and walking six hours of an eight-hour workday, sitting six hours, and was not otherwise physically limited.  (R. at 269).  Dr. Van Tran adopted the findings of Dr. Davoli, considering them to be consistent with the medical record.  (R. at 273-74).  Dr. Van Tran noted Plaintiff's unremarkable physical examinations and lack of significant treatment history for any physical ailments as support for the conclusion that Plaintiff had few physical limitations.  (R. at 273).

Three "Medication Management Psychiatric Evaluation Reviews" of Plaintiff were completed between November 2007 and June 2009 at Latrobe Area Hospital.  (R. at 295-99).  No behavioral or impulse control issues were found.  (R. at 299).  His psychomotor skills, appearance, and speech were always normal.  (Id.).  His thought processes were coherent and

goal oriented.  (Id.).  Plaintiff's cognition was grossly intact.  (R. at 295-96).  Consistently noted

difficulties generally included issues with anxiety, panic, and depression.  (R. at 295-99).

Plaintiff was placed on psychiatric medication.  (Id.).  He received a GAF score of 55 in

November 2007.  (R. at 299).

On August 4, 2009, Plaintiff underwent a psychological evaluation with Lindsey A.

Groves, Psy.D.  (R. at 309-21).  Dr. Groves administered the Wechsler Adult Intelligence Scale –

Fourth Edition.  (R. at 309).  Testing revealed a verbal comprehension score of 70, indicating

borderline intellectual functioning, and a perceptual reasoning score of 96, indicating average

intellectual functioning.  (Id.).  Plaintiff's full-scale IQ was determined to be 75, indicating

borderline intellectual functioning.  (Id.).  Dr. Groves concluded that Plaintiff had very limited

verbal skills and was unable to process information efficiently – indicating severe deficits in

short-term memory and psychomotor/processing speed.  (R. at 310).  Working memory was

moderately impaired.  (Id.).  Plaintiff, however, was capable of perceptually organizing

information.  (Id.).  He had moderate impairment maintaining attention and concentration.  (Id.).

In her psychological evaluation, Dr. Groves noted Plaintiff's complaints to include

difficulty with anxiety, depression, stress, migraine pain, and pain stemming from a past shingles

outbreak.  (R. at 311).  Plaintiff also mentioned his abdominal pain.  (Id.).  Based upon her

interview with Plaintiff, a review of the medical record, and the results of the intelligence testing,

Dr. Groves diagnosed Plaintiff with bipolar disorder, generalized anxiety disorder, and

borderline intellectual functioning.  (Id.).  Plaintiff's prognosis was poor given his history of low

intellectual functioning and mental health problems.  (R. at 312).  Plaintiff was recommended for

psychotherapy and medication management.  (Id.).  Dr. Groves believed Plaintiff to be ninety

percent permanently disabled. (R. at 313). Dr. Groves also felt that Plaintiff met the social security disability listings for affective disorders and anxiety related disorders. (Id.).

Dr. Groves opined that Plaintiff was disabled from full-time work. (R. at 313, 316). Specifically, Plaintiff's limitations were as follows: likely absence from work three or more times per month, marked restriction in activities of daily living, moderate restriction in maintaining social functioning, marked restriction in maintaining concentration, persistence, and pace, three episodes of decompensation of extended duration each year, and no ability to understand, remember, and carry out complex and/or detailed instructions. (R. at 316-17). Plaintiff was otherwise considered to be "good" or "fair" in all other areas of functioning. (R. at 319). His GAF score was 58. (R. at 314).

On August 11, 2009, Dr. Marrero assessed Plaintiff's ability to work based upon his migraine pain. (R. at 322-29). Dr. Marrero noted Plaintiff's continuation on prescription medication, and indicated that his prognosis was good. (R. at 323). Plaintiff was diagnosed with migraine headaches and muscle tension headaches. (R. at 325). Plaintiff's headaches could occur several times per week and last more than twenty-four hours. (Id.). Plaintiff would not be able to work while suffering a headache. (Id.). Plaintiff would need to rest and miss work as needed. (R. at 328). However, Dr. Marrero did not feel that Plaintiff was disabled, and stated that Plaintiff could maintain full-time employment with limitations to accommodate his condition. (R. at 324).

### D. Administrative Hearing

At his hearing, Plaintiff explained that he had difficulty with spicy foods and carbonated beverages. (R. at 366). Consuming these foods and beverages made it difficult for him to control his bowels, and often resulted in bleeding. (Id.).

Other conditions of note included migraine headaches, the residuals of a shingles outbreak, and Plaintiff's mental condition. (R. at 371-74). Plaintiff explained that he would have debilitating migraines every day without his prescribed medication. (R. at 372-73). Plaintiff's medication provided him with significant relief. (Id.). Plaintiff admitted that his only hospitalization on record for migraine headaches was the result of his failure to take his migraine medication. (R. at 380-81). Plaintiff, however, claimed to suffer significant side effects from his medications, including a feeling of drunkenness, dizziness, and nausea. (R. at 372).

Plaintiff claimed that the shingles outbreak he suffered damaged a nerve in his head that caused his face to become tingly and numb. (R. at 358-59). The shingles outbreak also affected his eyesight – resulting in some blurriness and sensitivity to light. (R. at 371). The ALJ questioned Plaintiff regarding the sporadic nature of his psychiatric treatment – noting that the record contained only three visits to mental health professionals over a two-year period. (R. at 362). Plaintiff responded by stating that he was usually given prescriptions which covered an extended period; that arrangement, however, recently changed and he was to begin quarterly seeing his doctor. (R. at 363).

Aside from running his tattoo business, Plaintiff had not looked for any other employment since 2006. (R. at 355). Plaintiff testified that he continued to work at his tattoo parlor from approximately two in the afternoon until approximately ten in the evening, four days per week. (R. at 351). While Plaintiff did not open his tattoo shop until two o'clock, he typically arrived at his place of business around noon. (R. at 359). Plaintiff's brother often came to help him. (R. at 351). Business was slow, and in the two weeks prior to his hearing Plaintiff had only earned fifty dollars. (R. at 352-53). Plaintiff explained that while he has difficulty with large groups of people, he can handle being around people in his tattoo shop, because it does not

involve crowds.  (R. at 360-61).  Settings such as a shopping mall are usually overwhelming for Plaintiff.  (R. at 361).

Plaintiff took his medications first thing in the morning.  (R. at 359).  He typically did not eat in the morning because it upset his stomach.  (Id.).  Upon returning home from work, Plaintiff usually took time to relax, and ate dinner.  (R. at 360).  In terms of daily activities and household chores, Plaintiff explained that he helped his wife with cleaning, dishes, laundry, shopping, simple cooking, and caring for their son.  (R. at 366-67).  Plaintiff also mowed the lawn.  (R. at 366).  Plaintiff was responsible for all driving, because his wife was unable to drive due to a seizure disorder.  (R. at 360).  Plaintiff testified that his wife helped him to keep track of their bills.  (R. at 353, 357).  Plaintiff stated that he had never written a check.  (R. at 357).

Plaintiff explained that he could not read or write very well.  (R. at 356).  As a result, he tended only to watch television.  (R. at 374).  He testified that he had no difficulties following what he was watching.  (Id.).  Plaintiff testified that he did not have many hobbies, but that he occasionally enjoyed painting pictures.  (R. at 368).  Plaintiff spent time with his brother regularly, but was not close with the rest of his family.  (R. at 369).  He testified that his wife, son and he occasionally spent time with his wife's family.  (Id.).

Following Plaintiff's testimony, the ALJ asked the vocational expert to characterize Plaintiff's previous employment.  (R. at 375).  The vocational expert indicated that Plaintiff's "floor cleaning" job was semi-skilled, heavy-duty work.  (R. at 375-76).  Plaintiff's manufacturing position was classified as "conveyor belt worker," and considered to be unskilled, medium exertional work.  (R. at 376).  Finally, Plaintiff's job at his tattoo parlor was classified as "tattoo artist," and considered to be semi-skilled, sedentary work.  (Id.).

The ALJ posed a hypothetical, asking the ALJ whether Plaintiff's past positions would be available to a person of Plaintiff's age, educational background, and work experience if he or she was limited to a medium range of work, allowing brief access to a restroom every two or two-and-a-half hours, requiring no more than simple, routine, repetitive tasks not performed in a production or quota based environment, involving no more than simple work-related decisions and relatively few work place changes, and only occasional interaction with supervisors, co-workers, and the general public, and no mathematical calculations such as would be required of a teller or cashier. (Id.).

The vocational expert responded by stating that none of Plaintiff's past jobs would be available to the hypothetical person described by the ALJ. (R. at 377). The ALJ inquired about whether other jobs existing in significant numbers in the national economy would be available to the hypothetical person. (Id.). The vocational expert replied that the hypothetical person could work as a "laborer in a shoe factory," with 123,804 positions available in the national economy, as a "packer," with 216,144 jobs available, as a "dietary aid," with 105,336 positions available, or as a "soft janitor," with 66,348 positions available. (R. at 378).

The vocational expert explained that full-time employment was characterized as working approximately thirty-six to forty hours per week. (R. at 379). Full-time jobs would typically allow for a thirty-minute to sixty-minute lunch break, and ten-minute breaks in the morning and afternoon. (Id.). Most employers would tolerate five unexcused absences per year – excluding vacation time and medical leave. (Id.). An employee would also be expected to be on-task approximately ninety percent of each work day. (Id.).

**IV.    STANDARD OF REVIEW**

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986).  When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., pt. 404, subpt. P, app'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy.  20 C.F.R. §404.1520(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003).  If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy.  *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues.  42 U.S.C. §§ 405(g)[3], 1383(c)(3)[4]; *Schaudeck v.*

---

[3]        Section 405(g) provides in pertinent part:

*Comm'r Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999).  Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole.  *See* 5 U.S.C. §706.  The district court must determine whether substantial evidence existed in the record to support the Commissioner's findings of fact.  *Burns v. Barnhart,* 312 F.3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion.  *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)).  If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive.  42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390.  When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision or reweigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered.  *Palmer v. Apfel,* 995 F. Supp. 549, 552 (E.D. Pa. 1998);  *see S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947).  The court will not affirm a determination by substituting what it considers to be a proper basis.  *Chenery*, 332 U.S. at 196-97.  "[E]ven where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence,

---

Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[4]     Section 1383(c)(3) provides in pertinent part:
        The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 90-91 (3d Cir. 1986).


V.    DISCUSSION

The ALJ concluded that Beard had medically determinable severe impairments, i.e., stomach ulcers, gastro esophageal reflux disease, history of migraine headaches, history of alcohol and cannabis abuse, major depression, and generalized anxiety disorder. (R. at 17). It was determined that Plaintiff maintained the capacity to perform medium exertional work, although limited to that which allowed brief access to a restroom every two or two-and-one-half hours during the workday, and which did not involve more than simple, routine, repetitive tasks not performed in a production or quota-based environment requiring more than simple, work-related decisions, mathematical calculations, frequent workplaces changes, or more than occasional interaction with supervisors, co-workers, or the general public. (R. at 20). Based upon the testimony of the vocational expert, the ALJ determined that a significant number of jobs existed in the national economy which Plaintiff could perform with said limitations, and therefore, Plaintiff was not entitled to disability benefits. (R. at 25-26).

Plaintiff objects to the ultimate decision to deny benefits, arguing that the ALJ erred in failing to find Plaintiff disabled at step 3 of the review process, in failing to accommodate fully Plaintiff's limitations in the hypothetical to the vocational expert, and by failing to accord proper weight to the physicians' opinions of record. Defendant counters that the ALJ properly accounted for all limitations established by the objective medical record, and that substantial evidence supported the denial of disability benefits.

When rendering a decision, an administrative law judge must provide sufficient explanation of his or her final determination to provide a reviewing court with the benefit of the factual basis underlying the ultimate disability finding. *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981) (citing *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 94 (1943)). While the administrative law judge need only discuss the most pertinent, relevant evidence bearing upon a claimant's disability status, he or she must provide sufficient discussion to allow the court to determine whether any rejection of potentially pertinent, relevant evidence was proper. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203-04 (3d Cir. 2008) (citing *Cotter*, 642 F.2d at 706; *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000). In the present case, the court could not discern an adequate justification in the ALJ's opinion for his findings at step 3 of the sequential evaluation.

Plaintiff first claims that he met the requirements for an automatic finding of disability at step 3, under listing 12.05C and D (Mental Retardation) of the impairment listings found in 20 C.F.R., Pt. 404, subpt. P, app'x 1. (R. at ECF No. 9 at 11-13). Listing 12.05 provides, in relevant part:

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
> …
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
> …
>
> D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R., pt. 404, subpt. P, app'x 1.  As pointed out by Plaintiff, the ALJ did not discuss listing 12.05C or D explicitly.

This court is mindful that as long as the ALJ's decision – when read as a whole – reveals that the ALJ considered the appropriate facts when deciding that a claimant did not meet any specific disability listings, the ALJ's determination is supported by substantial evidence. *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004).  An administrative law judge must adequately develop the case record and discuss the findings supporting his conclusion that none of the listings at step 3 are met. *Id.* at 504-05 (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-20 (3d Cir. 2000)).  Yet, in so doing, and administrative law judge is not required to "use particular language or adhere to a particular format in conducting his analysis." *Id.* at 505; *see Scatorchia v. Comm'r of Soc. Sec.*, 137 F. App'x 468, 470-71 (3d Cir. 2005) (An administrative law judge satisfies the standard articulated in *Jones* and *Burnett* "by clearly evaluating the available medical evidence in the record and then setting forth the evaluation in an opinion, even where the ALJ did not identify or analyze the most relevant listing."); *Scuderi v. Comm'r of Soc. Sec.*, 302 F. App'x 88, 90 (3d Cir. 2008) ("[A]n ALJ need not specifically mention any of the listed impairments.").

Listing 12.05D may be considered properly excluded in light of the ALJ's discussion of Plaintiff's activities of daily living, social functioning, concentration, persistence, and pace, and episodes of decompensation as reflected in the evidence of record.  (R. at 19).  Only the report of Dr. Groves provided evidence which would support disability under listing 12.05D, and – as pointed out by the ALJ – Dr. Groves' findings were clearly more severe than anything else found

on the record, particularly with respect to episodes of decompensation, about which there was no evidence in the record. (R. at 18-20).

Listing 12.05C, however, is a different matter. The Court of Appeals for the Third Circuit has read listing 12.05C as requiring a claimant to make two showings: (1) that evidence demonstrates subaverage general intellectual functioning with deficits in adaptive functioning prior to a claimant reaching age twenty-two, and (2) that evidence demonstrates an IQ score of 60-70 in conjunction with a physical or mental impairment. *Cortes v. Comm'r Soc. Sec.*, 255 F. App'x 646, 651 (3d Cir. 2007); *Stremba v. Barnhart*, 171 F. App'x 936, 938 (3d Cir. 2006); *see Markle v. Barnhart*, 324 F. 3d 182, 187 (3d Cir. 2003).

Once again, while an administrative law judge is not required to address explicitly a specific listing or to discuss evidence in any particular order, the court cannot consider an administrative law judge's analysis at step 3 to be sufficient where evidence which could render a specific listing applicable was not discussed. Here, the ALJ did not address two issues relevant to the applicability of listing 12.05C: Plaintiff's IQ scores, and Plaintiff's subaverage intellectual functioning with deficits in adaptive functioning prior to Plaintiff reaching the age of twenty-two. (R. at 18-24). Given that the record contains evidence which could potentially meet the above requirements under listing 12.05C, it is incumbent upon the court to remand for a thorough analysis by the ALJ. *See Markle*, 324 F. 3d at 189. In light of the necessity for the ALJ to address step 3 upon remand, the court will not reach the propriety of the ALJ's determinations at steps 4 and 5 of the required analysis. *Id.*

## VI. CONCLUSION

Based upon the foregoing, the court could not find that substantial evidence supported the ultimate disability determination; the ALJ did not sufficiently address step 3. "On remand, the ALJ shall fully develop the record and explain [his or her] findings… to ensure that the parties have an opportunity to be heard on the remanded issues and prevent *post hoc* rationalization" by the ALJ. *Thomas v. Comm'r of the Soc. Sec. Admin.*, 625 F.3d 798, 800-01 (3d Cir. 2010); *see Ambrosini v. Astrue*, 727 F.Supp.2d 414, 432 (W.D.Pa. 2010).

Accordingly, Plaintiff's Motion for Summary Judgment will be granted to the extent he seeks a remand for further consideration, and denied to the extent he seeks a reversal and an award of benefits in his favor and Defendant's Motion for Summary Judgment will be denied. The decision of the ALJ will be vacated and the case remanded for further consideration not inconsistent with this opinion. An appropriate order follows.

By the court,

*s/ Joy Flowers Conti*
Joy Flowers Conti
United States District Judge

Dated: February 14, 2012.